# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DISTRICT

| | | |
|---|---|---|
| **PATRICIA PERRY, et al.,** | ) | |
| | ) | |
| **Plaintiffs.** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-0005-CV-W-GAF** |
| | ) | |
| **JULIE KOVICH, in her individual** | ) | |
| **capacity, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by the Defendants.[1] (Doc. #49). The Plaintiffs, Patricia Perry ("Perry"), Marilyn McLeod ("McLeod") and Gloria Ware ("Ware"), filed this action pursuant to 42 U.S.C. §§ 1981 and 1983 asserting claims of disparate treatment, hostile work environment, and retaliation. (Doc. #1, #15). The Defendants argue that, based on the undisputed facts, the Plaintiffs have failed to present sufficient evidence to prove each of their claims. (Doc. #49). The Plaintiffs oppose this Motion arguing that their claims should be submitted to a jury. (Doc. #52). Upon careful consideration of the facts and arguments submitted by the parties, the Defendant's Motion for Summary Judgment is GRANTED.

## DISCUSSION

### I.      Facts

---

[1]Julie Kovich ("Kovich"), Barbara McDaniel ("McDaniel"), Barbara DeVille ("DeVille"), Margaret Randle ("Randle") and Mona Smith ("Smith"), all sued in their individual capacities, are collectively referred to as "Defendants."

Case 4:04-cv-00005-GAF   Document 70   Filed 02/17/06   Page 1 of 31

The Plaintiffs are African-American females and were formerly employed as caseworkers by the Division of Family Services (DFS) in Jackson County, Missouri.[2] As caseworkers, the Plaintiffs were generally responsible for managing a caseload of 300-400+ clients, conducting phone and walk-in interviews, drafting mail correspondence, screening clients for eligibility for state assistance programs (food stamps and various medical), and networking with other state and governmental agencies to address client needs and services.

The Plaintiffs were placed on a twelve month probationary period upon being hired, as is routine for all new caseworkers. During the probationary period caseworkers are required to present applications to a supervisor for their review before applications could be further processed. The supervisor would advise the caseworker on what was missing from the file or application before authorizing further processing.

During a caseworker's twelve month probationary period, the ninth and tenth month are considered "production months." Caseworkers are evaluated during these two months. Production during these two months determines whether new caseworkers successfully complete probation and are offered a permanent appointment with DFS. Caseworkers are expected to maintain a full caseload during the production months. The caseworker's immediate supervisor evaluates the caseworker in five areas and each area is weighted differently: Timeliness, 40%; Accuracy, 30%; Quantity of Work, 20%; Procedural, 5%; and Public Relations Skills, 5%. The areas of "Timeliness," "Accuracy," and "Procedural" are evaluated on

---

[2]As the Court must view the facts in the light most favorable to the Plaintiffs when ruling on this Motion, the facts asserted herein are derived from the Plaintiffs' admissions to the Defendants' statement of facts (Doc. #49) and the additional facts the Plaintiffs set forth in their Opposition to the present Motion (Doc. #52).

a scale of 0 to 100.[3] A caseworker must achieve the following marks to satisfy the requirements of the caseworker position and be considered a "successful caseworker": Timeliness, 97.0%; Accuracy, 89.1%; and Procedural, 89.1%. These marks correspond with a rating of "Successful," which is defined as: "Performance at this level meets expectations. It represents what is expected of a trained, experienced, successful employee."[4] A caseworker with marks below the requisite standard for a successful caseworker is labeled as either "Improvement Expected," which is defined as "[p]erformance at this level falls somewhat below what is expected of a trained, experienced employee" or "Unsatisfactory," which is defined as "[p]erformance at this level fails to meet the requirements of the position."

### A.    *Plaintiff McLeod*

Plaintiff McLeod was hired as an "income maintenance caseworker" on August 16, 2000 and was initially assigned to the downtown Kansas City office. Approximately two and a half weeks after she started her job with DFS, Plaintiff McLeod fell while crossing the street on her way to work and injured her knees, limiting her ability to walk. Plaintiff McLeod was subsequently transferred to the South Kansas City office to accommodate her physical limitations. Despite the fact that she was not on state property when the injury occurred, Defendant Randle approved Plaintiff McLeod's workers' compensation claim and allowed her to take two six week periods off of work. At all times relevant to the instant case, Plaintiff McLeod was supervised by Defendant Kovich.

---

[3]The two other areas, "Quantity" and "Public Relations," are evaluated on a different scale. However, neither party asserts that these scores are relevant to the Court's analysis.

[4]A caseworker with even higher marks could receive a rating of "Outstanding" or "Highly Successful" and expect to be offered a permanent position as a caseworker at the end of the probationary period.

Case 4:04-cv-00005-GAF   Document 70   Filed 02/17/06   Page 3 of 31

Plaintiff McLeod's performance was evaluated by Defendant Kovich on July 6, 2001, eleven months after Plaintiff McLeod began working for DFS. (Doc. #49, Ex. D). Defendant Kovich concluded that Plaintiff McLeod should receive a rating of "Unsatisfactory" and, therefore, Defendant Kovich did not recommend Plaintiff McLeod for permanent appointment. Id. In her review, Plaintiff McLeod received a score of 89.1% in Timeliness (minimum requirement: 97.0%) and 73.5% in Accuracy (minimum requirement: 89.1%). Id. On July 11, 2001, five days after this performance review, Plaintiff McLeod filed a Charge of Discrimination with the Missouri Department of Social Services. (Doc. #49, ¶ 73, Ex. L).

Defendant Kovich drafted an eight-page report detailing why Plaintiff McLeod should not be offered a permanent appointment as a caseworker. (Doc. #49, ¶ 25, Ex. F). This report outlines the number of applications Plaintiff McLeod processed each month and how many of these applications had underissuance errors, overpayment errors, underpayment errors, and were untimely processed. Id. At the conclusion of the report, Defendant Kovich recommended that Plaintiff McLeod be terminated as she demonstrated that she is unable to process applications in a timely and accurate manner. Id. In support of her recommendation, Defendant Kovich states:

> Ms. McLeod has been continually reminded of agency time frames and the need to process all applications in a timely manner, yet she fails to do so. Her actions continue to be a great hardship on the customer, as benefits are not issued timely. She is a burden to her co-workers, as she is unable to process her own food stamp applications or manage a full caseload. Her pending applications must be passed out to other workers as loan work or this Supervisor is processing [sic]. The agency has continued, for the past six months, to incur both dollar errors and timeliness errors because of Ms. McLeod's inability to handle the job of caseworker.

Id.

Defendant Kovich forwarded her report and recommendation to her supervisor, Defendant McDaniel. Defendant McDaniel agreed with Defendant Kovich's recommendation and forwarded it to the Office of the Administrator, Defendant Randle. Defendant Randle reviewed the recommendation, approved it and forwarded it to the Office of Human Resources in Jefferson City, Missouri. Defendant Smith then reviewed the recommendation, agreed with it and drafted the final letter of termination that was subsequently delivered to Defendant McLeod.

On August 13, 2001, Defendant Randle sent Plaintiff McLeod a letter notifying her that her employment with DFS would be terminated effective August 14, 2001. (Doc. #49, Ex. H). Defendant Randle provided Plaintiff McLeod with the following explanation for her termination: "The specific reason for your dismissal is your incompetent, inadequate, careless or inefficient performance of your duties as a Caseworker, and your failure to meet established minimum standards in the performance of such duties." Id. The letter proceeded to discuss, in great detail, Plaintiff McLeod's "Timeliness" and "Accuracy" scores in various performance reviews conducted throughout Plaintiff McLeod's employment and ultimately concluded:

> You have not attained a successful level of job performance for the position of Caseworker during your rating period. Written assistance and verbal assistance have been provided to assist you in becoming successful in your job duties, however, little improvement has been noted. These are some specific examples of your failure to consistently demonstrate the ability to perform the essential job components for the position of a Caseworker. The reasons stated above and further documented in the attached performance appraisal are deemed to be cause for your dismissal.

Id.

### B.     Plaintiff Ware

Plaintiff Ware was hired as an "income maintenance caseworker" by DFS and following her initial

5

training reported to the South Kansas City office on approximately September 16, 2000. While working at the South Kansas City office, Plaintiff Ware was supervised by Defendant Kovich.

Ten months later, on July 12, 2001, Defendant Kovich evaluated Plaintiff Ware and concluded that Plaintiff Ware should not receive a permanent appointment with DFS because her performance was "Unsatisfactory." (Doc. #55, Attach. B). Defendant Kovich based her conclusion on Plaintiff Ware's Timeliness score of 50.6% (minimum requirement: 97.0%) and Accuracy score of 71.6% (minimum requirement: 89.1%). Id. On July 16, 2001, four days after this performance review, Plaintiff Ware filed a Charge of Discrimination with the Missouri Department of Social Services. (Doc. #49, ¶ 73, Ex. L).

Defendant Kovich drafted a ten-page detailed report recommending that Plaintiff Ware not be offered a permanent appointment as a caseworker. (Doc. #49, ¶ 25, Ex. F). This report outlines the number of applications Plaintiff Ware processed each month and how many of these applications were completed untimely, expedited incorrectly, contained budgeting errors, contained accuracy errors and were ultimately given to other caseworkers to process. Id. Defendant Kovich ultimately concluded that Plaintiff Ware should be terminated as "she has shown throughout her probationary period she cannot process applications timely and accurately" and her "lack of organizational skills has contributed to [her] inability to track pending applications." Id. In support of her recommendation, Defendant Kovich states:

> Ms. Ware has been continually reminded of agncy [sic] time frames and the need to process all applications in a timely manner, yet she fails to do so. Her actions continue to be a great hardship on the customer, as benefits are not issued timely. She has not met the mission of the agency as she is unable to process her own food stamp applications or manage a full caseload. Her pending applications must be passed out to other workers as loan work or this Supervisor is processing [sic]. The agency has continued, for the past six months, to incur both dollar errors and timeliness errors because of Ms. Ware's inability to handle the job of caseworker.

6

Id.

Defendant Kovich forwarded her report and recommendation to her supervisor, Defendant McDaniel. Defendant McDaniel agreed with Defendant Kovich's recommendation and forwarded it to the Office of the Administrator, Defendant Randle. Defendant Randle reviewed the recommendation, approved it and forwarded it to the Office of Human Resources in Jefferson City, Missouri. Defendant Smith then reviewed the recommendation, agreed with it and drafted the final letter of termination that was subsequently delivered to Plaintiff Ware.

On August 10, 2001, Defendant Randle sent Plaintiff Ware a letter notifying her that her employment with DFS would be terminated effective August 14, 2001. (Doc. #49, Ex. G). Defendant Randle provided Plaintiff Ware with the following explanation for her termination: "The specific reason for your dismissal is your inadequate, careless or inefficient performance of your duties as a Caseworker, and your failure to meet established minimum standards in the performance of such duties." Id. The letter proceeded to discuss, in great detail, Plaintiff Ware's "Timeliness" and "Accuracy"scores in various performance reviews conducted throughout Plaintiff Ware's employment and concluded:

> Weekly conferences were scheduled with your supervisor to inform you of your overdue cases as listed on the Weekly Application Control Report. You were offered assistance in improving your timeliness and your procedural errors, and organizing your priorities for the week. The importance of timely completion of your applications was stressed at each conference. . . . You have not attained a successful level of job performance despite almost one year of training and supervisory assistance.

Id.

## C.    *Plaintiff Perry*

Plaintiff Perry was hired as an "income maintenance caseworker" in August 2000 and initially

reported to the downtown Kansas City office of DFS. After a short period of time, Plaintiff Perry was transferred to the South Kansas City office. Plaintiff Perry was initially supervised by Defendant Kovich in the South Kansas City office. However, within her first seven months, Plaintiff Perry's direct supervision was transferred to Defendant Deville. Plaintiff Perry alleges that she was told she was being transferred because she was "stressing Ms. Kovich out."

Plaintiff Perry asserts that as soon as she was transferred to Defendant Deville's supervision, her "production months" began, although she had only been employed by DFS for seven months. (Perry Dep. 42:12-16). Plaintiff Perry did not question why her production months were starting early. (Perry Dep. 43:6-8). Defendant Deville told Plaintiff Perry that she would only be allowed three mistakes on her "read sheet" under Defendant Deville's supervision. (Perry Dep. 42:12-44:9). A "read sheet" is the document upon which caseworkers are given feedback as to what information is still needed in a particular case. Supervisors also record any inaccuracies or mistakes on a caseworker's read sheet.

A few days later, Defendant Deville recorded three mistakes on Plaintiff Perry's read sheet. (Perry Dep. 43:9-11). After the three mistakes were recorded, Defendant Deville did not tell Plaintiff Perry that she was going to be terminated for making the three mistakes. (Perry Dep. 44:10-13). On the day she received the three mistakes, Plaintiff Perry, on her own initiative, called the personnel department seeking advice on whether she should resign or be terminated. She told personnel about "the three mistake conversation" and asked "if it would look better on [her] record if [she] resigned rather than be terminated." (Perry Dep. 44:16-45:4, 45:9-12). Plaintiff Perry testified that the woman in the personnel department "was noncomittal but she said she thought it would look better if [Plaintiff Perry] resigned." (Perry Dep. 45:6-8).

8

Plaintiff Perry decided to resign that day and sent a letter to Defendant DeVille, Defendant McDaniel and Defendant Randall stating:

> I, Patricia Perry resign my position as a Caseworker for the Department of Family Services. My last day will be May 3, 2001. Thank you for giving me the opportunity to work for the State of Missouri.

(Doc. #49, Ex. I). Plaintiff Perry testified in her deposition that after Defendant DeVille received the letter she laughed and said, "Well, I was supposed to do that," meaning, terminate Plaintiff Perry's employment. (Perry Dep. 46:5-7). Plaintiff Perry did not tell Defendant DeVille that she was resigning based on the three mistakes conversation. (Perry Dep. 42:12-47:10).

### D. The Present Lawsuit

The Plaintiffs filed the present lawsuit on January 6, 2004 asserting violations of 42 U.S.C. § 1981 ("§ 1981") based on disparate treatment, hostile work environment and retaliation. (Doc. #1). On May 26, 2004, the Plaintiffs amended their complaint to include claims under 42 U.S.C. § 1983 ("§ 1983") for violations of their rights under § 1981. (Doc. #15). The Defendants filed the present Motion for Summary Judgment arguing that the Plaintiffs have failed to present sufficient evidence to sustain each of their claims. (Doc. #49). The Plaintiffs oppose this Motion, contending that they have presented sufficient evidence for the case to be submitted to a jury. (Doc. #52).

### E Disparate Treatment

In Count I, the Plaintiffs allege that the Defendants violated § 1981 and § 1983 by treating the Plaintiffs "differently than similarly situated white employees in regard to the conditions and privileges of their employment, including, but not limited to training, promotion, evaluation of their work and performance, assignment of helpers, discipline, and the handling of work related injuries." (Doc. #15). The

9

crux of the Plaintiffs' disparate treatment claim is that, because they are African-American, the Defendants failed to provide them with sufficient training to enable them to receive satisfactory ratings on their performance reviews and be retained as permanent caseworkers. (Doc. #52). In short, the Plaintiffs allege that they were "set up to fail." Id.

The Plaintiffs contend that Defendant Kovich was not physically present to provide them with training because she was frequently out of the office at hair and nail appointments and she also took vacations. The Plaintiffs further contend that during training sessions Defendant Kovich would make "small talk" or discuss personal matters thereby failing to provide them with meaningful training.

According to Plaintiff Perry, Defendant Kovich was often in her office with the door closed and/or with other co-workers and Plaintiff Perry would have to wait to ask Defendant Kovich a question. However, Plaintiff Perry admits that if she would knock on Defendant Kovich's door and she wasn't assisting another caseworker, she would answer Plaintiff Perry's questions.

Plaintiff Ware contends that she sought additional MC+ training from Defendant Kovich. However, Defendant Kovich did not provide Plaintiff Ware with the requested training and told Plaintiff Ware that MC+ was easy and any additional training would not help her.

The Plaintiffs assert that "white employees were given direct hands on training at their desks while the Plaintiffs were not." The Plaintiffs further contend that they were not given "cheat sheets" which were provided to white employees. These "cheat sheets" are a training tool designed to help new caseworkers become acquainted with their jobs. However, Plaintiff Perry testified that after she asked for a "cheat sheet," Defendant Kovich gave her one.

In addition to the lack of training, the Plaintiffs contend that they were discriminated against in the

assignment of mentors. Specifically, Plaintiff Perry claims that she was not assigned a mentor and Plaintiffs Ware and McLeod allege that their mentors were not helpful. According to the Defendants, mentors were not automatically assigned, but rather were available upon the request of the employee.

With respect to disparate treatment in "evaluation of their work and performance," the Plaintiffs claim that one white caseworker, Vickie Smith ("Ms. Smith"), who started working at DFS at the same time as the Plaintiffs, did not have to start her production months at the same time the Plaintiffs began their production months. The Plaintiffs claim that due to the delay in the start of Ms. Smith's production months, Ms. Smith was afforded additional training that the Plaintiffs were denied. The Defendants explain, and the Plaintiffs do not dispute, that Ms. Smith failed the state exam on her first attempt, a prerequisite to the start of a caseworker's production months. Accordingly, the Plaintiffs, who did not fail the state exam on their first attempts, were required to start their production months, whereas the start of Ms. Smith's production months was delayed pending her passage of the state exam.

Finally, the Plaintiffs accuse the Defendants of disparate treatment in "discipline" and "work-related injuries." Plaintiffs McLeod and Ware contend that they were "written-up" when they were on an approved break. Plaintiff McLeod contends that she was treated differently with respect to her work-related injury because she is African-American.

### E. Hostile Work Environment

In Count II, the Plaintiffs allege that the Defendants violated § 1981 and § 1983 by subjecting the Plaintiffs to "different standards of performance and working conditions than white employees, including by not limited to, unequal workload, demeaning and harassing interrogations, unreasonable restrictions on communication with fellow employees, and unwarranted screening of mail and phone calls." (Doc. #15).

The Plaintiffs further contend that the derogatory comments Defendant Kovich made about certain African-American DFS clients and Defendant McDaniel's racially offensive stories created a hostile work environment. (Doc. #52).

The Plaintiffs allege that they were subjected to a hostile work environment because they carried an "unequal workload" when compared to other non-minority DFS employees. Plaintiffs McLeod and Ware claim that their files were not regularly "purged," meaning, "pulled out and . . . filed back into a room where they keep old files." (Ware Dep. 111:18-20). Because the files were not regularly purged, the Plaintiffs claim they were overburdened by large and cumbersome case files. Plaintiff McLeod testified that she asked Defendant Kovich to send a receptionist or someone to come around and pull out all her outdated files and purge them, but it was never done. (McLeod Dep. 36:18-21). Although she does not recall the names of white employees who had their files purged, Plaintiff McLeod claims that "[t]he whites had their cubicles purged." (McLeod Dep. 36:22, 37:12-16). When asked about the process by which files were purged, Plaintiff McLeod testified that she had observed either one of the receptionists or the woman who worked in the "closed" section pushing the "purge cart" around, but it would pass Plaintiff McLeod's cubicle without stopping. (McLeod Dep. 37:18-38:4). Plaintiff McLeod admitted that she did not know how the process of purging files actually worked. (McLeod Dep. 38:20-24). She did not know if the person pushing the purge cart was supposed to stop at each employee's cubicle and simply pick up the files the employee wanted to have purged or if it was the person's job to stop at the employee's cubicle and select the files to be purged. (McLeod Dep. 38:5-24). Plaintiff Ware further testified that she asked Defendant Kovich to pull her outdated files and file them in the back room, but Defendant Kovich never pulled Plaintiff Ware's outdated files and never told a clerical person to pull the files. (Ware Dep. 111:15-

12

25, 114:24-115:12).

Additionally, the Plaintiffs contend that they bore an "unequal workload" because they were required to provide information to their supervisors that was already in their case files. The Plaintiffs further assert that they would turn in case files to their supervisors for review and the files would sit on the supervisor's desk for days, delaying the processing of the files. Finally, the Plaintiffs state that their supervisors would remove case files from their desks and transfer them to other case workers or simply move them without telling the Plaintiffs. The Plaintiffs further contend that they were treated unfairly because they were not permitted to take time off during their production months.

In addition to their "unequal workload," the Plaintiffs assert that they were subjected to a hostile work environment because of "unreasonable restrictions on communication with fellow employees." The Plaintiffs claim that they "were not allowed to consult each other about procedures or processes, while the other non-black caseworkers were allowed to freely consult each other." When asked about this allegation, Plaintiff McLeod testified that when Defendant Kovich saw her seeking help from another caseworker Defendant Kovich said, "You're not supposed to do that. You're supposed to learn this on your own. That's what I'm here for." (McLeod Dep. 27:25-28:15). The record does not specify the race of the co-worker Plaintiff McLeod had asked for help. Plaintiff Perry, when asked about the same allegation, testified that Defendant Kovich said, "You guys shouldn't be talking to each other, you should come to me and, you know, ask me the questions." (Perry Dep. 40:3-10).

The Plaintiffs also assert that they were subjected to a hostile work environment due to the "unwarranted screening of mail and phone calls." Plaintiff McLeod claims she was harassed by Defendant McDaniel for using the fax machine. Plaintiff McLeod further claims that Defendant McDaniel would

13

screen her phone messages and toss them at her.

The Plaintiffs further characterize their work environmental as racially hostile because Plaintiffs McLeod and Ware claim that, unlike their non-minority co-workers, they were not allowed to come into work early or stay late. However, Plaintiff Perry maintains that she regularly came into work early, stayed after hours and worked on Saturdays.

Finally, the Plaintiffs claim that the comments Defendant Kovich made about certain African-American DFS clients were racially derogatory and created a hostile work environment. Plaintiff McLeod testified that Defendant Kovich would make racial comments about the picture identifications of African-American DFS clients such as: "Look at that hair"; "This picture is so dark, I can barely see the picture, I can barely see the face"; and commenting that the photograph resembled a "prison mug shot." (McLeod Dep. 41:5-24). Plaintiff McLeod testified that when she showed Defendant Kovich the photo identifications of white DFS clients, Kovich "never had anything to say, nothing negative, never." (McLeod Dep. 42:2-4).

Plaintiff Ware testified that she had taken the case file of an African-American female named "Mercedes" to Defendant Kovich for Defendant Kovich to expedite. (Ware Dep. 137:8-25). Defendant Kovich allegedly laughed when she saw the client's name and said, "What kind of name is that?" Id. Plaintiff Ware further testified that she never heard Defendant Kovich comment on any other names and "there were a lot of different names and odd names." (Ware Dep. 138:1-7).

Finally, Plaintiff Perry testified that Defendant Kovich would make "rude comments" about the photographs of African-American DFS clients. (Perry Dep. 37:1-24). Plaintiff Perry alleges that Defendant Kovich commented on a male client's "wide nose" and stated that she couldn't see the picture

14

of a female client "because it was too black." Id. According to Plaintiff Perry, Defendant Kovich also observed that a client "looked like they were drunk" and she would state "what was wrong with the picture." Id. Although Plaintiff Perry specifically recalls the incidents involving African-American clients, Plaintiff Perry admits "[i]t may have been a couple on white clients but it was the black clients" that she remembers. Id.

Plaintiffs further contend that Defendant McDaniel created a hostile work environment when she told two racially offensive stories. According to the Plaintiffs, Defendant McDaniel told a story at a monthly meeting with several caseworkers present about her experiences as a novice caseworker. Defendant McDaniel stated that when she first became a case worker she would have to go to the "black projects" which "intimidated" her, but later the black children identified her as the "Food Lady" and left her alone. During another monthly meeting, Defendant McDaniel told a story about her son bringing an African classmate home for Christmas. Defendant McDaniel allegedly commended that her son's guest did not eat as much as Julius Odguwe, an African-American caseworker at DFS.

### F.    Retaliation

In Count III, the Plaintiffs McLeod and Ware assert a claim of retaliation in violation of § 1981 and § 1983. Plaintiffs McLeod and Ware allege that during their employment with DFS they engaged in a protected activity, filing complaints of race discrimination, and were subsequently terminated for engaging in the protected activity. As mentioned above, Plaintiff McLeod filed a Charge of Discrimination with the Missouri Department of Social Services on July 11, 2001, five days after Defendant Kovich recommended that she be terminated based on her "Timeliness" and "Accuracy" scores. (Doc. #49, ¶ 73, Ex. L). On July 16, 2001, four days after Defendant Kovich recommended that she not be retained as a permanent

15

caseworker based on her inability to timely and accurately manage her case load, Plaintiff Ware filed a Charge of Discrimination with the Missouri Department of Social Services. Id.

## II.    Standard

The Defendants filed this Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering this Motion, the Court views all facts in the light most favorable to the Plaintiffs and gives them the benefit of all reasonable inferences. *See* Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997). The Court will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial. Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979); United States v. Porter, 581 F.2d 698, 703 (8th Cir. 1978).

The Defendants bear the burden of proving the absence of disputed material facts. *See* Prudential Ins. Co., 121 F.3d at 366. The burden then shifts to the Plaintiffs to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the Plaintiffs fail to establish a factual dispute on an essential element of their case, the Court will proceed to determine whether the Defendants are entitled to judgment as a matter of law. *See* E.E.O.C. v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001). To survive the Defendants' Motion for Summary Judgment, the Plaintiffs must provide sufficient, probative evidence which would permit a fact finder to rule in their favor as opposed to engaging in "mere speculation, conjecture or fantasy." Kneibert v. Thomson Newspapers, Michigan Inc., 129 F.3d 444, 455 (8th Cir. 1997) (en banc) *quoting* Wilson v. International Business Machines Corp., 62 F.3d 237, 241 (8th

16

Cir.1995). "Evidence, not contentions avoids summary judgment." Mayer v. Nextel West Corp., 318 F.3d 803, 809-10 (8th Cir. 2003).

The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. Prudential Ins. Co., 121 F.3d at 366. In the interest of promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. Inland Oil and Transp. Co. v. U.S., 600 F.2d 725, 728 (8th Cir. 1979).

## III.     Analysis

### A.     *Disparate Treatment*

The Plaintiffs allege that they were treated differently than similarly situated white employees in the conditions and privileges of their employment in violation of § 1981 and § 1983. Section 1981 prohibits race discrimination in making, performing, modifying, or terminating contracts, as well as in enjoying the benefits, privileges, terms and conditions of a contractual relationship. Section 1981 was enacted as part of the Civil Rights Act of 1966 for the purpose of "afford[ing] equal opportunities to secure the benefits of American life regardless of race." Long v. Ford Motor Co., 496 F.2d 500, 505 (6th Cir. 1974). Accordingly, § 1981 is violated "when an employer, public or private, places more stringent requirements on employees because of their race." Long, 496 F.2d at 505. Section 1983 provides a cause of action for deprivation of any rights, privileges, or immunities guaranteed under the Constitution or other laws. Here, the Plaintiffs seek to recover damages under § 1983 for violations of their rights under § 1981.

A plaintiff in a workplace race discrimination case filed pursuant to § 1981 and/or § 1983 can survive summary judgment in one of two ways. Russell v. Kansas City, Missouri, 414 F.3d 863, 866-67

Case 4:04-cv-00005-GAF   Document 70   Filed 02/17/06   Page 17 of 31

(8th Cir. 2005).[5]  First, the plaintiff can produce direct evidence of discrimination, that is, "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Russell, 414 F.3d at 866 *quoting* Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).  Here, the Plaintiffs do not contend that there is direct evidence of discrimination on the record.

In the absence of direct evidence of intentional discrimination, "a plaintiff may survive an employer's motion for summary judgment by 'creating the requisite inference of unlawful discrimination' through the familiar three-step burden-shifting analysis originating in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."  Russell, 414 F.3d at 866-867.  In the first stage of the McDonnell Douglas analysis, the Plaintiffs bear the burden of establishing a prima facie case of race discrimination.  *See* McDonnell Douglas, 411 U.S. at 802.   If the Plaintiffs present facts sufficient to support a prima facie case, then the burden shifts to the Defendants to rebut the prima facie case by articulating legitimate, non-discriminatory reasons for their actions.  *See* Id.  If the Defendants satisfy this burden, the Plaintiff must show that the Defendants' explanation for its action was merely pretextual.  *See* Hossani v. Western Missouri Medical Center, 97 F.3d 1085, 1088 (8th Cir. 1996).

The facts of the instant case differ somewhat from the McDonnell Douglas case in that this  case involves the nonretention of an employee, rather than a refusal to hire.  The Supreme Court noted that the

---

[5]Although Russell involved a Title VII claim, the Eighth Circuit has previously found that the body of law which governs Title VII also governs § 1981 and § 1983 claims.  *See* Chambers v. Wynne Sch. Dist., 909 F.2d 1214, 1216 (8th Cir. 1990) ("The McDonnell Douglas test has been used to evaluate the plaintiff's prima facie showing of discrimination for claims under 42 U.S.C. §§ 1981 and 1983 as well.")  Accordingly, the Court will proceed to analyze the Plaintiffs' § 1981 and § 1983 claims simultaneously under the McDonnell-Douglas framework.

Case 4:04-cv-00005-GAF   Document 70   Filed 02/17/06   Page 18 of 31

prima facie case articulated in <u>McDonnell Douglas</u>[6] must be applied flexibly in order to operate in the varying factual contexts in which discrimination claims arise. <u>Tart v. Levi Strauss and Co.</u>, 864 F.2d 615, 618 (8th Cir. 1988) *citing* <u>McDonnell Douglas</u>, 411 U.S. at 802 n. 13. The Plaintiffs in the present case argue that their nonretention is attributable to the Defendants' racially-motivated failure to provide them with adequate training.

To make out a prima facie case of discriminatory failure to train the Plaintiffs must demonstrate that: (1) they are members of a protected group; (2) the Defendants provided training to their employees; (3) the Plaintiffs were eligible for training; and (4) the Plaintiffs were denied training given to other similarly situated employees who were not members of the protected group. *See* <u>Pafford v. Herman</u>, 148 F.3d 658, 667 (7th Cir. 1998), <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649-650 (4th Cir. 2002), <u>James v. Western Nat'l Mut. Insur. Co.</u>, 2001 WL 436121 (D. Minn. 2001); *See also* <u>Lopez v. Metropolitan Life Ins. Co.</u>, 930 F.2d 157, 161 (2nd Cir. 1991).[7] It is undisputed that all three Plaintiffs are members of a protected group as they are all African-American. Therefore, the question presented in the present Motion is whether the Plaintiffs have presented sufficient evidence from which a reasonable juror could conclude that the Plaintiffs were denied training provided to similarly situated non-minority

---

[6]The prima facie case articulated in <u>McDonnell-Douglas</u>, 411 U.S. at 802, required the plaintiff to prove: (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

[7]In <u>Lopez</u>, 930 F.2d at 161, the Second Circuit held that to establish a prima facie case of discriminatory denial of training, the plaintiff must demonstrate: (1) that she is a member of a protected group; (2) that she satisfactorily performed the duties required by her position; (3) that the employer had a policy of providing on-the-job training, and (4) that she was not provided training under circumstances giving rise to an inference of discrimination.

19

employees.

The Plaintiffs contend that Defendant Kovich was not physically present to provide them with training because she was frequently out of the office at hair and nail appointments and she also took vacations. However, if Defendant Kovich was not in the office, she clearly wasn't providing training to anyone - regardless of race. The Plaintiffs further contend that during training sessions Defendant Kovich would make "small talk" or discuss personal matters thereby failing to provide them with meaningful training. The Plaintiffs did not present any evidence that these training sessions were segregated by race. Therefore, again, if Defendant Kovich was making small talk and/or discussing personal matters during employee training sessions, no employee who was attending the sessions was receiving meaningful training - regardless of race.

Plaintiff Perry contends that Defendant Kovich was often in her office with the door closed and/or with other co-workers and Plaintiff Perry would have to wait to ask Defendant Kovich a question. However, Plaintiff Perry further testified that if she would knock on Defendant Kovich's door and Defendant Kovich was not with another employee, she would assist Plaintiff Perry. The Plaintiffs failed to present any evidence that non-minority employees were treated any differently, i.e., that non-minority employees did not have to knock on Defendant Kovich's door to ask for assistance and/or wait to ask a question if Defendant Kovich was assisting another employee.

Finally, Plaintiff Ware contends that she sought additional MC+ training from Defendant Kovich who told her that MC+ was easy and additional training would not help her. However, the Plaintiffs failed to present any evidence that non-minority employees who sought additional MC+ training were given the requested training whereas minority employees were denied the additional training. All the foregoing

20

factual assertions are insufficient to give rise to an inference of racial discrimination because there is no evidence that the Plaintiffs were being treated differently than other non-minority employees.

The Plaintiffs do assert that "white employees were given direct hands on training at their desks while the Plaintiffs were not." However, the Plaintiffs fail to present any evidence identifying the white employees who were provided the training that the Plaintiffs were denied. The Plaintiffs further contend that they were not given "cheat sheets" that were provided to non-minority employees. These "cheat sheets" function as a training tool designed to help new caseworkers become acquainted with their job. However, Plaintiff Perry testified that after she asked for a cheat sheet, Defendant Kovich provided her with one. Again, the Plaintiffs failed to provide the Court with the names of non-minority employees who received "cheat sheets," when the "cheat sheets" were received, and if the employees asked for the "cheat sheets." The Plaintiffs' assertion that white employees were given adequate training and "cheat sheets" whereas African-American employees were not is a wholly conclusory, generalized and non-specific claim of disparate treatment.

In addition to the lack of training, the Plaintiffs contend that they were discriminated against in the assignment of mentors. Specifically, Plaintiff Perry claims that she was not assigned a mentor and Plaintiffs Ware and McLeod allege that their mentors were not helpful. The Defendants contend that mentors were not automatically assigned, but rather were available upon request of the employee. Again, the Plaintiffs have not offered any evidence that white employees were assigned mentors automatically and that these mentors were helpful. Without evidence that non-minority employees were treated differently than minority employees, the Plaintiffs have failed to present sufficient evidence from which a jury could conclude that the Plaintiffs were denied training based on a racial animus.

21

The Plaintiffs further contend that Ms. Smith, a white caseworker who started at the same time as the Plaintiffs, did not have to start her production months at the same time as the Plaintiffs and, therefore, was afforded additional training which the Plaintiffs were denied. However, the Defendants contend, and the Plaintiffs do not dispute, that Ms. Smith was not "similarly situated" because unlike the Plaintiffs who passed the state exam on their first attempt, Ms. Smith failed the state exam. According to the Eighth Circuit, to be considered "similarly situated" the comparable employee "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." <u>Tolen v. Ashcroft</u>, 377 F.3d 879, 882-83 (8th Cir. 2004). Here, Ms. Smith was not similarly situated because she was subject to different standards than the Plaintiffs as she failed the state exam. Individuals who pass the state exam proceed into the production months whereas individuals who fail the state exam are given an additional opportunity to take the exam prior to beginning their production months. Defendant McDaniel testified that this decision is not made locally, but rather is made at a higher level or is a policy established by Human Resources in Jefferson City. There is no evidence to rebut the presumption that had the Plaintiffs failed the state exam on their first attempt, they would have been permitted to delay entry into their production months. However, since the Plaintiffs passed the state exam on their first attempt, they were treated the same as all the other new caseworkers who passed the exam and were required to begin their production months.

The Plaintiffs further accuse the Defendants of disparate treatment in "discipline." The Plaintiffs McLeod and Ware contend that they were "written-up" when they were on an approved break. To establish a prima facie case of disparate treatment in discipline, the Plaintiffs must show that a non-minority employee was involved in or accused of the same or similar conduct, but was disciplined in a different way.

Case 4:04-cv-00005-GAF   Document 70   Filed 02/17/06   Page 22 of 31

*See* Wheeler v. Aventis Pharmaceuticals, 360 F.3d 853, 857 (8th Cir. 2004).  However, again, the Plaintiffs fail to present any evidence that non-minority employees were not disciplined or disciplined less severely for the same or similar conduct.

Finally, the Plaintiffs contend that they were treated differently with respect to work-related injuries because the are African-American.  Plaintiff McLeod is the only Plaintiff who allegedly injured herself at work.  Despite the fact that she was not on state property when the injury occurred, Defendant Randle approved Plaintiff McLeod's workers' compensation claim and allowed her to take two six week periods off of work.  The Plaintiffs failed to identify any similarly situated non-minority employees who suffered work-related injuries and were treated differently.

The Plaintiffs have not alleged sufficient facts to support the inference that racial animus motivated the Defendants.  To survive summary judgment, the Plaintiffs must put forth something more than a mere scintilla of evidence that they were treated differently from other similarly-situated non-minority employees.  The bare assertion that white employees received adequate training and black employees did not is insufficient to satisfy this burden.  Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' claims of disparate treatment arising under § 1981 and § 1983.

B.      *Hostile Work Environment*

The Plaintiffs allege that they were subjected to a racially hostile work environment in violation of § 1981 and § 1983.  To prevail on a hostile work environment claim, the Plaintiffs must prove that: "(1) they are members of a protected group; (2) there was "unwelcome harassment"; (3) there was a causal nexus between the harassment and membership in the protected group; and (4) that the harassment affected a term, condition or privilege of employment." Williams v. ConAgra Poultry Co., 378 F.3d 790, 794 (8th

23

Cir. 2004) *citing* <u>Palesch v. Missouri Comm'n on Human Rights</u>, 233 F.3d 560, 566 (8th Cir. 2000).  To be actionable, a work environment must have been "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998).  In determining whether a work environment was objectively offensive, the Court examines "all the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993).  A plaintiff is only entitled to recover damages on his or her hostile work environment claim "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Harris</u>, 510 U.S. at 21 *quoting* <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 66 (1986).

"There can be no doubt federal harassment standards are demanding." <u>Al-Zubaidy v. TEK Industries, Inc.</u>, 406 F.3d 1030, 1038 (8th Cir. 2005).  Federal law which prohibits hostile work environments should not be construed to enforce a "general civility code." *See* <u>Faragher</u>, 524 U.S. at 788. Accordingly, "simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Al-Zubaidy</u>, 406 F.3d at 1039 *quoting* <u>Faragher</u>, 524 U.S. at 788 *quoting* <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).  "The Court implores lower courts to apply the demanding harassment standards to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" <u>Id</u>. (internal citations omitted).

24

Here, the Plaintiffs allege five categories of allegedly offensive behavior in support of their hostile work environment claim. However, the Plaintiffs have failed to present any competent evidence linking the allegedly offensive conduct to a race-based animus. Furthermore, the evidence presented by the Plaintiffs fails to demonstrate that, under the totality of the circumstances, the allegedly offensive conduct was so severe and pervasive as to alter a term or condition of the Plaintiffs' working environment.

First, the Plaintiffs allege that they were subjected to a racially hostile work environment because they had an "unequal workload." The Plaintiffs assert that this "unequal workload" is evidenced by the fact that their files were not purged. However, as the Plaintiffs were admittedly unaware of the proper protocol for purging files, it is impossible to determine whether the fact that the Plaintiffs' files were not purged is attributable to the Plaintiffs' inaction or some race-based animus by Defendant Kovich. There is absolutely no evidence of the later, which the Plaintiffs bear the burden of proving to present a prima facie case of hostile work environment to the jury.

Additionally, the Plaintiffs contend that they bore an "unequal workload" because they were required to provide information to their supervisors that could be found in their case files, case files that were given to supervisors for review would sit on the supervisor's desk for days, and supervisors would remove case files from the Plaintiffs' desks without telling them and transfer them to other case workers. However, there is no evidence demonstrating the requisite causal nexus between this allegedly offensive behavior and the Plaintiffs' membership in the protected group. The supervisors' conduct is illustrative of the ordinary tribulations of the workplace and there is no evidence whatsoever that their conduct was motivated by race.

The Plaintiffs further contend they were subjected to a hostile work environment because they

25

were not permitted to take time off during their production months. This allegation is unsupported by the record as the Plaintiffs admit that Plaintiff McLeod was permitted to take time off during her production months. Therefore, this allegation does not support the Plaintiffs' hostile work environment claim.

Second, the Plaintiffs allege that they were subjected to a racially hostile work environment because they were "subjected to unreasonable restrictions on communication with fellow employees." The Plaintiffs contend that Defendant Kovich told them they could not talk to each other. However, the record reveals that Defendant Kovich merely advised them to direct work-related questions to her, rather than each other. Furthermore, the Plaintiffs have not offered any evidence to support their contention that "non-black caseworkers were allowed to freely consult each other." Defendant Kovich's request that the Plaintiffs direct their work-related questions to her and complete their own work is another example of the ordinary demands of the workplace and absent evidence to the contrary, cannot be construed as race-based "unwelcome harassment."

Third, the Plaintiffs contend that they were subjected to a racially hostile work environment due to the "unwarranted screening of mail and phone calls." In support of this contention, Plaintiff McLeod claims that she was harassed by Defendant McDaniel for using the fax machine and that Defendant McDaniel would screen her phone messages and toss them at her. Again, there is no evidence in the record to support the conclusion that Defendant McDaniel's conduct was motivated by some race-based animus. Accordingly, this evidence fails to support the Plaintiffs' hostile work environment claim.

Fourth, the Plaintiffs contend that they were subjected to a racially hostile work environment because Plaintiffs McLeod and Ware assert that they were not allowed to come into work early or stay late whereas their non-minority co-workers were permitted to work extended hours. However, Plaintiff

Perry maintains that she regularly came into work early, stayed after hours and worked on Saturdays. The fact that a similarly situated member of the protected group was not subjected to the same "unwelcome harassment" negates the Plaintiffs' claim that the offensive conduct was based on a racial animus. Accordingly, because members of the protected group were permitted to work extended hours, the Plaintiffs were not subject to a racially hostile work environment because they were not permitted to work extended hours to complete their work.

Fifth, the Plaintiffs contend that Defendant Kovich's derogatory comments about African-American DFS clients and Defendant McDaniel's racially offensive stories created a hostile work environment. Defendant Kovich's comments included: "Look at that hair," "This picture is so dark, I can barely see the picture, I can barely see the face," and commenting that a client's photograph resembled "a prison mug shot." Defendant Kovich laughed when she saw a client's name, Mercedes, and commented, "What kind of name is that?" Defendant Kovich also pointed out a male client's "wide nose," stated that she couldn't see the picture of a female client "because it was too black," and observed that one client "looked like they were drunk." Defendant McDaniel told two stories, one of which described her experiences as a novice caseworker distributing food stamps in the "black projects" and in the other story, Defendant McDaniel observed that her son's African classmate did not eat as much as an African-American caseworker. None of these comments involve objectively offensive racial slurs or epithets and none of these comments were directed at the Plaintiffs.

Plaintiff Perry testified that Defendant Kovich's comments were not confined to African-American DFS clients, but also extended to white clients. The Plaintiffs cannot prove that they were singled out for harassment on the basis of their race if persons who were not members of the protected group were subject

27

to the same harassment. "An offensive workplace atmosphere does not amount to unlawful discrimination unless one [race] is treated differently than the other." *See* <u>Oncale v. Sundowner Offshore Servs. Inc.</u>, 523 U.S. 75, 80 (1998). The fundamental issue is whether members of one race are subjected to unfavorable conditions or employment that the members of another race are not. <u>Id</u>. Here, Plaintiff Perry's testimony establishes that both races were the subject of Defendant Kovich's allegedly derogatory comments. Accordingly, the Plaintiffs have failed to prove that they were subjected to unwelcome harassment on the basis of race.

Based on the foregoing, it is clear that the Plaintiffs have failed to present evidence linking the Defendants' conduct to some race-based animus. The Plaintiffs offer little more than speculation and conjecture to make the required connection from the mistreatment they allege and a race-based animus. Therefore, the Court finds that the Plaintiffs have failed to raise a material issue of fact concerning whether they were subjected to workplace harassment because of their race.

Furthermore, the Plaintiffs cannot convince a reasonable jury that the unwelcome harassment they suffered was sufficiently severe or pervasive to alter a term, condition or privilege of their employment. Much of what the Plaintiffs characterize as "unwelcome harassment" such as the unpurged case files, supervisors failing to promptly review case files and provide feedback, case files being reallocated to other case workers for processing, being asked to complete work independently and direct work-related questions to supervisors are merely "ordinary tribulations of the workplace." The average employee routinely faces many of these same problems – regardless of their race. "Not all unpleasant conduct creates a hostile work environment. Rather the plaintiff must show that she was singled out because of her [race], and that the conduct was severe and pervasive." <u>Palesch</u>, 223 F.3d at 657. A reasonable juror would not

28

conclude that the common struggles of the American workforce are sufficient to support a hostile work environment claim as such difficulties cannot be construed as being "sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See* Harris, 510 U.S. at 23.

The Plaintiffs further contend that the Defendants created a hostile work environment by making derogatory comments about African-American DFS clients and telling racially-charged stories. Although the Plaintiffs may have found these comments offensive, "the statements do not constitute 'a steady barrage of opprobrious racial comments' sufficient to support a § 1981 hostile work claim." Elmahdi v. Marriott Hotel Services, Inc., 339 F.3d 645, 653 (8th Cir. 2003) *quoting* Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981). Ultimately, the Plaintiffs have failed to prove that the allegedly offensive conduct permeated the workplace, thereby altering a term or condition of the Plaintiffs' working environment.

### C.    Retaliation

Plaintiffs McLeod and Ware allege that during their employment with DFS they engaged in a protected activity, filing complaints of race discrimination with the Missouri Department of Social Services, and, as a result, the Defendants' retaliated against them by terminating their employment. To establish a prima facie case of retaliation a plaintiff must demonstrate that "(1) she filed a charge of discrimination; (2) the employer subsequently took the adverse employment action against her; and (3) the adverse action was causally linked to the filing of the charge of discrimination." Manning v. Metropolitan Life Ins. Co., Inc., 127 F.3d 686, 692 (8th Cir. 1997) (internal citations omitted). "Once the prima facie showing is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." Id.

"If the employer meets that burden, the presumption of retaliation disappears." Id.

Here, Plaintiff McLeod filed her charge of race discrimination with the Missouri Department of Social Services five days *after* she received unfavorable ratings on a performance review wherein Defendant Kovich recommended that she be terminated. Similarly, Plaintiff Ware filed her charge of race discrimination four days *after* Defendant Kovich recommended that she not be retained as a permanent caseworker. Although the actionable adverse employment action, Plaintiffs' ultimate termination, occurred after the Plaintiffs filed complaints of race discrimination, the circumstances giving rise to the recommendation that the Plaintiffs' employment be terminated occurred prior to the charges of discrimination being filed. The Plaintiffs do not dispute that Defendant Kovich's decision not to recommend them for permanent employment was based on the unsatisfactory ratings they achieved during their production months. (Doc. #49, ¶ 71; Doc. #52, ¶ 71). As Defendant Kovich's recommendation that the Plaintiffs not be offered permanent employment due to their unsatisfactory ratings in the areas of "Timeliness" and "Accuracy" proceeded the Plaintiffs' charges of race discrimination and the Plaintiffs do not dispute this legitimate, non-discriminatory rationale for terminating their employment, the Defendants are entitled to summary judgment on the retaliation claims asserted by Plaintiffs McLeod and Ware.

## CONCLUSION

The Plaintiffs have failed to present sufficient evidence to prove each of their claims. With respect to their disparate treatment claim, the Plaintiffs have failed to assert facts to support the inference that the Defendants' failure to adequately train the Plaintiffs was motivated by some race-based animus. Similarly, the Plaintiffs' hostile work environment claim cannot be submitted to the jury because the Plaintiffs have failed to present any competent evidence linking the Defendants' allegedly offensive conduct to the

Plaintiffs' race and the Plaintiffs further failed to demonstrate that the Defendants' conduct was so severe and pervasive as to alter a term or condition of the Plaintiffs' working environment. Finally, the Plaintiffs have failed to state a submissible retaliation claim because the Plaintiffs engaged in the protected activity after the decision to terminate their employment was made and the Plaintiffs do not dispute that they were terminated because of their unsatisfactory "Timeliness" and "Accuracy" scores.

As evidence, not contentions, is required to defeat a motion for summary judgment, the Defendants are entitled to summary judgment on all claims. According, the Defendants' Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

**/s/ Gary A. Fenner**
**GARY A. FENNER, JUDGE**
**United States District Court**

**DATED:  February 17, 2006**

31